# In the United States Court of Federal Claims

### No. 12-488C
### (April 30, 2015)

| | |
|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * * <br><br> THE MEYER GROUP, LTD., <br><br> Plaintiff, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. <br><br> * * * * * * * * * * * * * * * * * * * * * * * * | Contract Disputes Act; Commercial Real Estate Brokerage Agreement; Extension Clause; Real Estate Leases; Federal Rule of Evidence 801(d)(2); Breach of Contract; Damages Equaling Brokerage Commissions On Transactions That Occurred After Brokerage Agreement Was Terminated; Expectation Damages; Market Rate for Real Estate Brokerage Commissions. |

Thomas E. Shakow, Aegis Law Group, LLP, 801 Pennsylvania Avenue, N.W., Suite 740, Washington, D.C., 20004, for Plaintiff.

Stuart F. Delery, Jeanne E. Davidson, Donald E. Kinner, and Douglas T. Hoffman, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., 20044, for Defendant.

---

### OPINION AND ORDER

---

**WILLIAMS**, Judge.

   Plaintiff, The Meyer Group, Ltd. ("Meyer Group"), claims that the Government, through the Postal Regulatory Commission ("PRC") breached an exclusive real estate brokerage agreement ("Agreement") by refusing to recognize Plaintiff as its real estate broker and the "procuring cause of" certain lease transactions. Specifically, Plaintiff claims that PRC improperly failed to request that the landlord pay Plaintiff commissions based on four lease transactions that it procured for PRC, after the termination of its Agreement. Plaintiff seeks $469,516.35 in damages plus interest under the Contract Disputes Act ("CDA").[1] Pl. Post-Trial Br. 74-75.

---

[1]   Plaintiff calculates this figure as 4% of the lease transactions at issue -- the Seventh Amendment to the Original Lease $11,491,021.71 ($459,640.87) and 4% of three Bryan Cave subleases, $59,565.00 ($2,382.60), $26,250.00 ($1,050.00), and $161,072.00 ($6,442.88). Pl. Post-Trial Br. 74-75.

This matter comes before the Court following a trial on liability and damages. The Court finds that PRC breached the Agreement by failing to recognize Plaintiff as its exclusive broker and procuring cause with respect to two claimed transactions. Specifically, PRC failed to inform the landlord that Meyer Group was the procuring cause of both the Seventh Amendment to the Original Lease and the first Bryan Cave Sublease. JX 27 at 2. Consequently, the landlord failed to pay Meyer Group its agreed-upon commissions. The Court finds that Meyer Group "submitted" the location of the Seventh Amendment to the Original Lease to PRC within the meaning of the Agreement prior to termination and that the Agreement covered this transaction even though it was consummated 655 days after the Agreement was terminated. The Court also finds that Meyer Group "submitted" the location of the fifth floor Bryan Cave sublease to PRC during the life of the Agreement and that the Agreement covered this transaction even though it occurred 412 days after the Agreement was terminated. The Court finds that Meyer Group did not submit the location of the second Bryan Cave sublease to PRC and that the third Bryan Cave sublease was not covered by the Agreement because it occurred 825 days after the Agreement was terminated.

To remedy this breach, the Court awards Plaintiff damages equaling the commissions Plaintiff lost – a 3.5% commission, or $402,185.76, for the Seventh Amendment to the Original Lease, and a 3% commission, or $1,923.75, for the first Bryan Cave sublease, totaling $404,109.51, plus interest calculated pursuant to 41 U.S.C. § 7109(a)(1).

## Findings of Fact [2]

## The Parties and Other Key Individuals

Meyer Group is a licensed real estate brokerage company with its principal place of business in the District of Columbia. JSF ¶ 3. William Meyer, also known as Bill Meyer, is founder, President, and owner of Meyer Group. Tr. 15:19-16:3 (Meyer). James Rayborn worked as a Senior Vice President for Meyer Group. JX 12 at 1. Meyer Group also employed Mekonnen Tekle, who performed lease audits and financial analyses for clients. JX 244 at 6:7-20. Meyer Group typically represents tenants in office lease negotiations. Tr. 16:6-8 (Meyer).

PRC is an independent agency that was known as the Postal Rate Commission until 2006, when the Postal Accountability and Enhancement Act changed the agency's name to the Postal Regulatory Commission. JSF ¶¶ 1-2. PRC's offices are located at 901 New York Ave, NW,

---

[2]     These findings of fact are derived from the record developed during a two-day trial, held May 7-8, 2014, and from the parties' Joint Stipulations of Uncontested Material Fact ("JSF") and Additional Joint Stipulations of Uncontested Material Facts ("AJSF").

Additional findings of fact are in the discussion. The Court uses "PX" to cite Plaintiff's exhibits, "JX" to cite joint exhbits, and "Tr." to cite testimony. At trial, Plaintiff called William Meyer, Shoshana Grove, and Chairman Ruth Goldway as fact witnesses, and David Ellis Kaplan as an expert witness. Defendant called Chairman Goldway and Ms. Grove as fact witnesses, and James Warkentin as an expert witness.

Upon review of the record, the Court ordered Plaintiff to file a supplemental brief "setting forth with citations to the record, the total gross aggregate lease value for the Seventh Amendment to the Original Lease . . . , and an explanation of how such values were calculated." Plaintiff filed this supplemental brief on November 26, 2014, and Defendant filed a response on January 5, 2015.

Washington, D.C. ("the Building").  JSF ¶ 1. When Meyer Group starting working with PRC in October 2003, its main points of contact were PRC's Secretary and Chief Administrative Officer, Steve Williams, and the Deputy Secretary, Garry Sikora.  After Messrs. Williams and Sikora left the agency in 2009, Meyer Group communicated first with Judy Grady, the Assistant Director of Strategic Planning, and then Shoshana Grove, who became Secretary and Chief Administrative Officer in September 2009.  Tr. 197:4-25 (Goldway).  Ms. Grove reported to Chairman Ruth Goldway, who was a Commissioner of PRC starting in 1998, and became Chairman in 2009. Tr. 196:15-22; 198-14-15 (Goldway).

The landlord for the Building was BP/CRF 901 New York Ave, LLC ("BP/CRF"), and Meyer Group and PRC had communications with employees of Boston Properties ("BP"), a joint venture partner in the ownership of the Building. JSF ¶¶ 6-7. Mr. Gregory Storrs was responsible for leasing vacant office space in the building.  Id. ¶ 8. Mr. Storrs, who has been in commercial real estate since 1986, was BP's Director of Leasing for Washington, D.C., and was responsible for five buildings BP owned, including 901 New York Ave, NW. JX 243 at 9:2-18.  The parties also communicated with Ms. Susan DeRosa, a BP property manager for 901 New York Ave, NW. Id. at 17:21-18:1.

## The Start of the Relationship Between Meyer Group and PRC

Meyer Group's relationship with PRC began in 2002, when, upon learning PRC was seeking to relocate to new office space in Washington, D.C., Meyer Group began contacting PRC with information about the real estate market.  Eventually Meyer Group was interviewed to become PRC's broker. JX 1-4; Tr. 17:18-23 (Meyer).  In 2003, before the Agreement was signed, Meyer Group provided services to PRC, including taking PRC employees on building tours, because Mr. Meyer felt that he had a "green light" from PRC that he would be its broker.  Tr. 19:11-21; 130:2-10 (Meyer).  Mr. Meyer would not have taken PRC employees on tours without an understanding that Meyer Group would be engaged as a broker, because he expected a commission if PRC ended up signing a lease.  Id. at 129:15-130:10.

After being selected, Meyer Group wrote the exclusive brokerage Agreement, and on October 28, 2003, Mr. Rayborn sent the Agreement to PRC's Deputy Secretary, Mr. Sikora, inviting him to make changes.  JX 20 at 1; Tr. 19:11-20:23 (Meyer).  PRC did not make any changes to the Agreement.  Tr. 20:3-8 (Meyer).  Over six months later, on May 5, 2004, the then-Chairman of PRC signed the Agreement.  JX 27.

The Agreement, written from the perspective of PRC, provided, in full:

The Meyer Group, Ltd. is hereby appointed, through its representatives, William J. Meyer and James M. Rayborn, as our exclusive real estate broker and will be given the exclusive right to assist us in obtaining a lease or purchasing premises in the Washington, D.C. metropolitan area. The appointment of The Meyer Group, Ltd. is effective for a period of twelve (12) months from the date that you countersign this letter, and will continue on a calendar month-to-month basis thereafter unless The Meyer Group, Ltd. receives written notice to the contrary. Postal Rate Commission, on ten (10) days written notice to The Meyer Group, Ltd, may terminate this agreement for non-performance at any time.

The Meyer Group, Ltd. will use its best efforts to secure a location or locations satisfactory to us. We will cooperate with you in good faith in your efforts to secure satisfactory premises and to maintain this relationship. In that regard, we will, among other things, refer to The Meyer Group, Ltd. all inquiries and offerings received by us with respect to the lease of such premises, regardless of the source of such inquiry or offerings. All negotiations will be conducted solely by The Meyer Group, Ltd. and under its direction, subject to our final approval. The Meyer Group, Ltd. will have no authority to sign a lease, or make any financial commitments, on our behalf.

The Meyer Group, Ltd. will acquire information on all locations that meet our requirements. The Meyer Group, Ltd. will carefully select and present to us those locations, which are the most suitable for our purposes.  If and when we decide on a location, The Meyer Group, Ltd. will negotiate the terms of the lease taking advantage of its knowledge of real estate market and the terms of the leases previously negotiated by The Meyer Group, Ltd.

We recognize that the landlord generally assumes responsibility for the commission of The Meyer Group, Ltd. and of any other licensed real estate broker whose cooperation is solicited. We will therefore cooperate and work with The Meyer Group, Ltd. in its efforts to obtain its commission. In that regard, we shall inform the landlord of The Meyer Group, Ltd.'s representation of us before entering into any lease agreement. We shall also recognize and confirm The Meyer Group, Ltd. as the procuring cause of and in the said transaction. We shall further require, as a condition of entering into a lease agreement, that the landlord undertake an obligation to pay a commission (in accordance with typical market rates) to The Meyer Group, Ltd., which obligation shall be set forth in the lease agreement or in a written side agreement.

<u>Subsequent to the expiration or termination of this agreement, we will continue to recognize The Meyer Group, Ltd. as our exclusive broker and the procuring cause in accordance with the provisions hereof, with respect to any prospective locations that have been submitted by The Meyer Group, Ltd. during the term of this agreement.</u> In addition, The Meyer Group, Ltd. will have thirty (30) days after expiration or termination of this agreement to provide to us a list of those prospective locations submitted to us during the term of this agreement.

Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association in Washington, D.C., in accordance with its applicable rules, and judgment on the award may be entered in any court with jurisdiction thereof.

If the foregoing accurately sets forth our agreement, please sign and return the enclosed copy of this letter. The parties whose signatures appear below represent and warrant that they are duly authorized to enter into and execute this agreement.

JX 27. (emphasis added).  As the underlined text discusses what should occur after the Agreement ends, the parties refer to this text as the "extension clause."   The Agreement was signed on May

5, 2004, by Mr. Meyer on behalf of Meyer Group and then-Chairman Omas on behalf of PRC. JSF ¶¶ 4-5.

## PRC's Original Lease of April 7, 2005, Procured by Meyer Group

On April 7, 2005, with Meyer Group's aid, PRC entered into a lease agreement with BP/CRF for approximately 29,102 square feet of rentable office space located at 901 New York Avenue, NW, Washington, D.C. ("Original Lease"). JSF ¶ 10; JX 29.  The Original Lease covered the entire second floor of the west tower of the Building and a portion of the second floor of the east tower. JX 29 at 4. The Original Lease specified that the landlord recognized Meyer Group as the broker procuring this lease, and that Meyer Group would receive a commission pursuant to a separate agreement.  Id. at 43.

As contemplated by the Agreement, Plaintiff received a commission from the landlord, BP/CRF, for this lease.  JSF ¶ 9; JX 28. Meyer Group and the landlord entered into a separate Commission Agreement on March 25, 2005, in anticipation of the signing of the Original Lease. JX 28.  This commission was $467,523.64, 4% of the aggregate lease value for the initial 10-year term.  JSF ¶ 13.  Mr. Meyer also arranged for construction management services to be provided to PRC by Peter Magellan for construction done as part of the move to the Building.  JX 14.

Two law firms in the Building, Finnegan Henderson Farabow Garrett & Dunner, LLP ("Finnegan Henderson") and Goodwin Procter, LLP ("Goodwin Procter"), had encumbrances on PRC's leased space.  JSF ¶ 15; JX 29 at 53-54.  Finnegan Henderson had a right of first offer ("ROFO") on some of PRC's space and Goodwin Procter had a "must-take" in its own lease that required it to take some of PRC's space in 2012.  JSF ¶ 15.  Finnegan Henderson communicated with Meyer Group regarding removing the ROFO "such that PRC could sign a lease extension in early 2009."  The ROFO was actually removed "in early 2012."  AJSF ¶¶ 45-46.  While the Original Lease's termination date was in 2015, this lease included a provision giving PRC the right to terminate the Original Lease early, effective June 30, 2012.  JX 29 at 49.  The timing of PRC's termination would have a "ripple effect" on the other tenants' rights and obligations, as well as on PRC's ability to find new office space.  JX 206 at 1.

## Meyer Group's Brokerage Services After the Original Lease

After signing the Original Lease on April 7, 2005, PRC behaved as if Meyer Group was still its real estate broker.  On August 17, 2005, PRC and the landlord entered into the first amendment to the Original Lease for additional storage space. JX 32.  Mr. Meyer was not asked to assist with this amendment because the storage space agreement was ancillary and not a transaction that warranted his involvement.  Tr. 130:15-131-11 (Meyer).

Mr. Meyer continued working with PRC after the storage space amendment.  In February 2006, Mr. Meyer presented a market survey of possible alternative spaces to PRC's Messrs. Williams and Sikora, and presented a second market survey at a meeting with them on November 28, 2006.  JX 33, 35; Tr. 26:5-27:1 (Meyer).  PRC was interested in potentially moving to another office after the expiration or termination of the Original Lease.  Mr. Meyer set up a building tour for June 15, 2007 and provided a third market report on October 24, 2007.  Tr. 31:18-33:2 (Meyer); JX 47.  On June 13, 2007,  PRC's Deputy Secretary Sikora emailed other PRC employees, including Mr. Williams and Judy Grady, about the building tour, and referred to Meyer Group as

PRC's "real estate broker." JX 43 at 1; Tr. 31:5-17 (Meyer). On October 24, 2007, Meyer Group presented a Mid-Year Office Market Report to PRC and arranged for presentations to PRC's Mr. Williams, Mr. Sikora and former Chairman Blair on November 6, 2007, by four real estate companies about potential properties for PRC to lease. JX 47; JX 48; Tr. 34:3-35:4 (Meyer).

Mr. Meyer's brokerage work on behalf of PRC continued into 2008. On January 23, 2008, PRC's Deputy Secretary Sikora emailed his colleagues, including Ms. Grady, stating that "our broker, Bill Meyer" had informed him that Goodwin Procter might wish to obtain PRC's space sooner than expected, and that Mr. Meyer suggested viewing two new properties. JX 51.

**Third Floor Space From Powell Goldstein/Bryan Cave**

In November 2008, Mr. Meyer learned that the law firm Powell Goldstein was planning to merge with Bryan Cave, potentially making new space in the Building available for PRC to lease. AJSF ¶ 31; JX 55. This space included the entirety of the third floor of the Building, and the east side of the fourth and fifth floors. JX 58 at 2. On November 12, 2008, Mr. Meyer sent an inquiry to Bryan Cave's real estate broker about this space, stating that he represented PRC. AJSF ¶ 35; JX 57; Tr. 40:22-41:22 (Meyer). This exchange was forwarded to PRC's Mr. Sikora. At the end of November 2008, Powell Goldstein's brokers sent Mr. Meyer information about the space. Mr. Meyer forwarded this information to PRC and discussed it with Mr. Sikora. JX 58-59; Tr. 42:3-19 (Meyer). On December 2, 2008, Mr. Meyer lead PRC staff members on a tour of the Powell Goldstein space. JX 60; Tr. 42:20-43:23. Bryan Cave and Powell Goldstein merged on January 1, 2009. AJSF ¶ 37.

In January 2009, Mr. Meyer was invited by Powell Goldstein's brokers to a meeting of brokers who represented different tenants in the Building who were interested in the Powell Goldstein space. JX 61; Tr. 44:5-45:17 (Meyer). The purpose of this meeting was to discuss with Mr. Storrs, the landlord's Vice President, adjusting the various overlapping tenants' expansion rights while facilitating the subletting of Powell Goldstein's space. JX 61. Mr. Meyer was instrumental in setting up the meeting, and the brokers for the various law firms were interested in talking to him because they knew that PRC was looking for new space. Tr. 44:19-45:9 (Meyer). Mr. Meyer gave PRC an update on the meeting results immediately after the meeting occurred. Id. at 45:18-22.

On February 12, 2009, a broker from CB Richard Ellis ("CBRE") emailed PRC's Mr. Williams and offered floor plans of the Powell Goldstein space for him to review. JX 62. This email informed Mr. Williams that Powell Goldstein was vacating space in the building on the 3rd, 4th and 5th floors. Id. CBRE continued: "[t]heir lease term goes through March 2015, which almost matches yours (8/2015) though you do have a mutual termination right in June 2012." Id. PRC's Mr. Williams rebuffed the CBRE broker and informed him that "our Broker, Bill Meyer" had already taken PRC on a tour of the space and "ha[d] already opened discussions with the other parties on the opportunities that may exist." Id.

On February 13, 2009, Powell Goldstein's broker sent Mr. Meyer a proposal for PRC to sublease the third floor area of the Powell Goldstein space, but this proposal did not include the fourth and fifth floors. JX 63. In Powell Goldstein's proposal, Mr. Meyer is referred to as PRC's broker. Id. at 3. Mr. Meyer forwarded this proposal to PRC's Mr. Sikora and suggested discussing it. JX 64. This proposal was not pursued further, but the record does not indicate why.

**Goodwin Procter Work in 2009**

In March and April 2009, Mr. Meyer attempted to resolve Goodwin Procter's "must-take" encumbrance on PRC's behalf. This "must-take" required Goodwin Procter to take some of PRC's leased space in 2012. JSF ¶ 15. Mr. Meyer communicated with Goodwin Procter's broker and Mr. Storrs of BP several times about the status of the "must-take" in March and April 2009. JX 68. These emails were forwarded to PRC's Mr. Sikora. Id.

**Additional Work in 2009**

Mr. Meyer arranged a tour of a property at 455 Massachusetts Ave, NW on May 29, 2009, for PRC. JX 70-71; Tr. 49:8-50:5 (Meyer). This tour was rescheduled to June 16, 2009. JX 73. PRC's Ms. Grady then reached out to Mr. Meyer and asked him to schedule another tour of this building for then-Chairman Blair on June 30, 2009. JX 75. On June 19, 2009, Ms. Grady sent an email inviting several PRC staff members to the June 30, 2009 tour, including Ruth Goldway, who became Chairman in August 2009. JX 79. In this email, Ms. Grady referred to Mr. Meyer as "PRC's real estate broker." Id.

**Major Personnel Changes at PRC: July – September 2009**

On July 2, 2009, Mr. Williams retired as Secretary and Chief Administrative Officer from PRC and Mr. Sikora left within a very short time thereafter. JX 72 at 2;Tr. 51:9-13 (Meyer). These departures lead to a new appointee, Ms. Goldway, becoming Chairman of PRC in August 2009, and Ms. Grove assuming Mr. Williams' position as Secretary and Chief Administrative Officer in September 2009. JSF ¶¶ 16-17. When PRC hired Ms. Grove as Secretary and Chief Administrative Officer in September 2009, she was tasked with reviewing all of PRC's contracts for various services. Tr. 207:18-24 (Goldway). Chairman Goldway testified that Ms. Grove informed her that PRC's records were "in dismal shape, and that there were very few records for contractual services that we were under." Tr. 209:11-18 (Goldway). In a similar vein, Ms. Grove testified that all of PRC's files were paper files and not well organized. Tr. 386:2-7 (Grove).

Ms. Grove had no knowledge of the Agreement and was concerned that PRC had previously entered contracts that "either weren't efficient or weren't well-managed." Tr. 388:1-11 (Grove). Ms. Grove testified that Ms. Grady, who was one of the few original PRC employees remaining, did not tell her that Meyer Group was PRC's real estate broker. Id. 137:10-15. Chairman Goldway was also unaware of PRC's Agreement with Meyer Group. After Mr. Williams left in June 2009, Ms. Grady became Mr. Meyer's point of contact at PRC for a few months until Ms. Grove came on board in August 2009, when Ms. Grove became the primary PRC contact for Mr. Meyer. JX 72.

On September 1, 2009, PRC's Chief Counsel, Michael Ravnitzky, forwarded an email to Chairman Goldway that he had received from Meyer Group's Mr. Rayborn about a possible property tour. Tr. 204:4-5 (Goldway); JX 89. The subject line of this email was "meeting with real estate broker." Id. In September of 2009, Mr. Meyer met with Chairman Goldway and Ms. Grove. To Mr. Meyer, this was a meeting to get them up to speed on PRC's situation in 901 New York Ave, NW, and on the status of buildings PRC was considering. Tr. 58:10-25 (Meyer). Because PRC had the option to terminate the Original Lease early, effective June 30, 2012, PRC was interested in advance planning for any possible move. JX 29 at 49. Ms. Grove testified that

she told Mr. Meyer that while he may have had a prior relationship with PRC, it did not mean that he would have one going forward. Tr. 162:1-10 (Grove).

Mr. Meyer did not consider his meetings with Ms. Grove and Chairman Goldway, or the services that he provided, to be an interview or marketing attempt, but instead part of his continuing responsibility as PRC's broker.  See Tr. 66:5-11.  Despite having received an email as recently as September 1, 2009, describing Mr. Meyer or Meyer Group as PRC's broker, and knowing that PRC's records were poor, Chairman Goldway did not attempt to ascertain whether or not Mr. Meyer had a contract with PRC.  See JX 89.  Neither Chairman Goldway nor Ms. Grove contacted their predecessors Mr. Williams or Mr. Sikora to find out what relationship PRC had with Mr. Meyer.  Tr. 137:10-18 (Grove).  Ms. Grove testified that when Mr. Meyer came in for his first meeting with the newly appointed Chairman, in September 2009, Ms. Grady told her that Mr. Meyer was a broker who had worked on the past lease.  Tr. 389:21-390:4 (Grove).

Also in September 2009, Ms. Grove met with a representative of CBRE brokerage who dropped by unannounced.  Tr. 142:11-21 (Grove).

## Meyer Group's Brokerage Services from Late November 2009 to Termination on March 29, 2010

Mr. Meyer met with Ms. Grove on November 24, 2009.  JX 97; 99.  In preparation for this meeting, Mr. Meyer offered to perform a lease audit for PRC free of charge.  JX 97. Meyer Group did perform a lease audit, which is dated December 8, 2009. JX 106.

Previously, PRC had been having plumbing issues in the Commissioners' bathrooms and in December 2009, temperature issues arose.  JX 115 at 4; JX 113; Tr. 153:23-155:24 (Grove); JX 121; Tr. 159:12-160:6. Mr. Meyer received a call from Ms. Grove at 7:30 a.m. on December 11, 2009, about the temperature issues.  JX 115 at 2.  Mr. Meyer received emails from Ms. Grove and Ms. DeRosa regarding these issues and forwarded them to Mr. Magellan, who had previously provided construction services for PRC.  Mr. Magellan sent a long email back stating that Ms. Grove "has the propensity to blow things out of proportion and only tell her side of the story."  Id. Mr. Magellan also emailed Mr. Meyer and suggested that BP check in with the Commissioners and not Ms. Grove.  Id. at 1.  Mr. Meyer then forwarded the entire email chain to Ms. Grove.  Id.

For his part, Mr. Meyer was confused as to why he was being called on to address facilities issues, but as an exclusive real estate broker, he did work for clients on an ongoing basis and felt that as PRC's real estate broker, he should contact Mr. Magellan about the problems.  Tr. 63:13-64:19 (Meyer). Mr. Meyer also communicated with Mr. Storrs, the landlord's Vice President, about PRC's frustration regarding facilities issues and continued following up into January 2010.  JX 125-130.  Neither Chairman Goldway nor Ms. Grove found Mr. Meyer useful in resolving these concerns.  Ms. Grove testified that she called upon Mr. Meyer due to his work on the Original Lease and because she thought he was trying to win their business. Tr. 151:10-152:3 (Grove).

Ms. Grove also asked Mr. Meyer for help with locating space.  Tr. 146:3-14 (Grove).  In an email dated December 31, 2009, she told Mr. Meyer that they needed to "discuss exploring other lease options beginning in January."  JX 124.  This request was made after Mr. Meyer forwarded to Ms. Grove an update from the landlord about the plumbing situation.

On January 7, 2010, Mr. Storrs of BP sent Mr. Meyer a proposal for the extension of PRC's lease term. JX 131; Tr. 68:15-23.  The proposal expressly named PRC as Mr. Meyer's client and contained a provision that PRC's broker would receive a commission if the extension were executed:

> Brokerage Commission:  After full execution and approval of a lease amendment extending Tenant's term based on the terms outlined herein, Landlord shall pay a market leasing commission to Broker based on the additional lease value as outlined in a separate agreement.

JX 131. This proposal was for the same space that eventually became the subject of the Seventh Amendment to the Original Lease – 29,102 square feet on the second floor east and west tower of 901 New York Ave, NW – a transaction at issue here.  Compare JX 131 with JX 232. After receiving the proposal from Mr. Storrs, Mr. Meyer forwarded the proposal to his colleague, Mr. Tekle on January 12, 2010, and asked him to "[p]repare numbers." JX 138. When Mr. Storrs emailed Mr. Meyer to follow up about the lease extension proposal, on January 21, 2010, Mr. Meyer informed Mr. Storrs that PRC was "out looking at space,"  and that that neither Mr. Meyer nor PRC was convinced that it was "the deal of the century" because the "[m]arket is soft but your proposal doesn't seem to reflect that." JX 146.  Mr. Storrs responded that it was a "pretty sweet" deal and indicated that Mr. Meyer would not get a better price.  Id.

Mr. Meyer forwarded this proposal to Ms. Grove and suggested they meet and discuss it. JX 131 at 1.  Ms. Grove testified that she did not respond to the proposal because she had not asked for it. Tr. 402:1-10 (Grove).  Nonetheless, Ms. Grove continued to meet with Mr. Meyer, and on January 12, 2010, requested that they sit down and lay out a schedule for further building tours. JX 139.  Ms. Grove could not explain why she did not tell Mr. Meyer to stop holding himself out as PRC's broker if she was merely giving him a trial and was not "sold" on him.  Tr. 167:7-168:12 (Grove).  The Court finds that while Ms. Grove was unaware of the Agreement, she accepted services from Mr. Meyer knowing that the landlord of 901 New York Ave, NW, BP, considered Mr. Meyer to be PRC's broker and that Mr. Meyer expected to receive a commission if he secured a lease in BP's building for PRC.

On January 14, 2010, and January 15, 2010, Mr. Meyer and Ms. Grove met to prepare for tours of seven buildings with other PRC staff, including Chairman Goldway.  JX 142-143; Tr. 70:25-71:17 (Meyer); Tr. 170:6-174:8 (Grove).  Meyer Group also provided PRC with a market survey. JX 145.  These tours occurred on January 20, 2010, and Mr. Meyer followed up with Ms. Grove on January 30, 2010, by emailing and requesting to meet with Ms. Grove to review the properties that they had visited.  JX 145, 151; Tr. 74:21-76:15 (Meyer); Tr. 175:3-21 (Grove). Chairman Goldway was not satisfied with the options and information presented by Mr. Meyer and testified that she "was never impressed with the ability of [Meyer Group] to explain the situation we were in or the likelihood that we could sort out the lease." Tr. 360:3-18 (Goldway).

On February 25, 2010, another meeting between PRC and Meyer Group occurred that involved a presentation of a building located at 10th and G Streets, NW, a property that, according to Mr. Tekle of Meyer Group, Ms. Grove had been asking about. JX 161.

On March 2, 2010, Mr. Meyer and Mr. Storrs, representing the landlord, discussed the January 7, 2010 lease extension proposal covering the 29,102 square feet in the east and west

towers, including PRC's desire for a longer lease term and tenant improvement funds to fix the plumbing issues. JX 162. This discussion took place after Mr. Meyer had conversations with PRC about BP's January 7, 2010 lease extension proposal. Tr. 81:13-20 (Meyer).

In an email to other BP employees, dated March 3, 2010, Mr. Storrs noted that a proposal had been sent to PRC and that he had talked with Mr. Meyer, who had indicated that PRC wanted a longer term and requested that the landlord pay to fix the plumbing system. JX 162. Mr. Storrs stated that he would ask Mr. Meyer to send a formal written counterproposal. Id. On March 17, 2010, Mr. Storrs emailed Mr. Meyer asking when Meyer Group would submit a counteroffer. JX 169. Mr. Meyer then quickly emailed Mr. Tekle asking "[c]an we work on a counter please?" Id.

On March 26, 2010, Mr. Tekle emailed Mr. Meyer to discuss items to put in the counterproposal. Id. The record contains an unsigned draft counterproposal dated March 26, 2010 for leasing 29,102 square feet in the second floor east and west towers.[3] JX 169 at 5-7; JX 170. The draft counterproposal contains comments from the author in the text. JX 169 at 5-7, JX 170. For example, in the provision describing the premises as 29,102 square feet, a comment asked "HOW DO WE CHANGE TO 35,000 SF?" JX 169 at 5-7, JX 170. The draft counterproposal is not attached to any email showing it was sent to the landlord. Mr. Meyer testified that he submitted the counteroffer to BP. Tr. 80:17-19 (Meyer). However, Mr. Storrs was shown the counterproposal during his deposition and testified that he did not receive it. JX 243 at 22:1-17. When Mr. Tekle was deposed on October 25, 2013, he did not know if the counterproposal had been submitted to the landlord and could not recall preparing it. JX 244 at 34:3-12. There are no contemporaneous documents in the record showing the transmission of Meyer Group's counterproposal to BP or BP's response to Meyer Group's counterproposal.

Mr. Storrs acknowledged that negotiations for the Seventh Amendment to the Original Lease began in 2009, when Mr. Meyer was representing PRC, that he was interacting with Mr. Meyer as PRC's broker for the lease extension, and that he understood that Mr. Meyer expected a commission out of the deal.[4] JX 243 at 19:8-22:13.

**Termination and Post-Termination Events**

Ms. Grove met with a representative of CBRE brokerage who dropped by unannounced in September 2009. Tr. 142:11-21 (Grove). The exact date PRC hired CBRE is not in the record, but at some point before terminating Meyer Group, Chairman Goldway, Ms. Grove, and the director of PRC's Office of General Counsel had a meeting with a representative from CBRE and were very impressed. Tr. 366:6-20 (Goldway). In a March 26, 2010 email, Mr. Storrs informed other BP employees that he had run into a CBRE broker at the "GWCAR Awards," who mentioned that he had been hired by PRC to represent them going forward. JX 171. Mr. Storrs stated that this was "[g]ood news," although the CBRE broker "may try even harder than Bill to move them." Id. Ms. Grove testified that PRC hired CBRE before Meyer Group's Agreement was terminated

---

[3]     The counterproposal also bears the date April 25, 2012.

[4]     Mr. Storrs did not testify at trial, but his deposition, taken on March 26, 2013, is in the record. JX 243.

so that PRC would have "a path forward." Tr. 190:4-6 (Grove).[5]  PRC and CBRE did not enter into a written brokerage agreement until August 5, 2011, over a year and four months after Meyer Group's Agreement was terminated.  Ms. Grove believed that CBRE brought more resources to the table than Mr. Meyer, as she stated that she thought PRC would be better served by a larger agency.  Tr. 403:10-22 (Grove).

On March 29, 2010, three days after Meyer Group created the draft counterproposal for the lease extension for PRC in the building, Ms. Grove terminated the Agreement in an email:

> I want to thank you for the real estate brokerage services your firm has provided. At this juncture, the Postal Regulatory Commission has determined that working with the United States Postal Service facilities team and a larger firm that they have recommended best meets our needs. For this reason we will no longer be using your services.  I apologize for having to inform you by email. We attempted to contact you by phone, but I understand you are skiing. Please don't hesitate to contact me if you have any questions or concerns.

JX 172.

The next day, on March 30, 2010, Mr. Meyer called Ms. Grove and informed her that under the Agreement, PRC was obligated to work with Meyer Group post-termination for properties that Meyer Group had submitted.  Tr. 83:14-84:9 (Meyer).  This was the first time Ms. Grove became aware of the Agreement. Tr. 405:1-5.  Mr. Meyer sent Ms. Grove a copy of the Agreement, and on March 31, 2010, Ms. Grove responded that her March 29, 2010 email served as written notification that PRC was terminating "any and all representation agreements we may have with Meyer Group."  JX 176.

On April 6, 2010, Mr. Meyer faxed Ms. Grove a list of properties he felt had been previously submitted to PRC during the term of the Agreement ("protective list").  JX 182; Tr. 84:12-24 (Meyer). This list included the Building and 25 other properties, which were listed on the market survey Meyer Group had given to PRC during the January 14, 2010 meeting.  Although Mr. Meyer attempted to communicate further with PRC about the Building, PRC made clear that it did not think Meyer Group was entitled to any further compensation.  JX 197 at 2.

## PRC's Formal Engagement of CBRE on August 5, 2011, and the Lease Extension of January 13, 2012

On March 31, 2010, in an email to other brokers representing tenants in the Building, Goodwin Procter's broker discussed lease negotiations between BP and PRC and stated:

---

[5]     Ms. Grove was asked on cross-examination:

Q: You didn't want to be without a real estate broker, right?

A: I would say that we were looking for a path forward, and that at that time, our determination was that – that Bill was not the best to serve our needs.

Tr. 190: 7-11 (Grove).

Earlier this week, I had a lengthy meeting with Boston Properties relative to the Postal Rate Commission (PRC) and the timing/status of the Landlord's negotiations with PRC. As you know from our initial discussions in February, 2009 and subsequent, these muti-party transactions include the Landlord's lease extension with PRC, which must occur in order for the Landlord to convert Floor 4 East to a prime lease with [Redacted]. Unfortunately, PRC has had a change in Administrative Director which is leading to a change in real estate broker – selected new broker but must get paperwork completed, do research, formulate objectives, etc. BP indicates that this process and the hopeful future PRC lease extension may realistically take another 6 months and up to 12 months due to such changes.

JX 179. According to Mr. Storrs, the change in "brokerage representation, for PRC in 2010, delayed [PRC's] ability to respond to any proposals we had issued. It was my understanding that they had terminated their agreement with The Meyer Group and had engaged CBRE as their broker. And until that process was complete, they could not – weren't willing to engage in any further negotiations." JX 243 at 22:4-13.

On November 15, 2010, CBRE presented a proposal on behalf of PRC for the second floor premises, the site of the Original Lease, to Mr. Storrs. JX 201 at 1. CBRE worked with BP on behalf of PRC and on April 1, 2011, a year and two days after Meyer Group's brokerage agreement had been terminated, BP/CRF sent a counterproposal to PRC via CBRE. JX 205 at 1. Mr. Storrs stated that this counterproposal was coming "[a]t long last." Id. Chairman Goldway described this counterproposal as "the culmination of the work we did" and "the beginning of a reasonable lease agreement we could settle on." Tr. 375:20-376:11 (Goldway).

On May 25, 2011, roughly a year and two months after Meyer Group's Agreement was terminated, PRC and BP/CRF signed a letter of intent to extend the term of the Original Lease through August 31, 2022. JX 208. This letter of intent stated that the premises would remain as 29,102 square feet "representing the entire second (2nd) floor of the West Tower and a portion of the second floor of the East Tower." Id. This is the identical space covered by the Original Lease. Compare JX 29 with JX 208.

Although the May 25, 2011 letter of intent stated that the landlord was required to prepare a lease amendment, the Original Lease was not amended until January 13, 2012, over seven months later. The letter of intent and the January 13, 2012 amendment are similar; the only differences are the addition of contract boilerplate and detail to the key terms. This delay in executing the Seventh Amendment to the Original Lease after the letter of intent was not due to changes in the substance of the lease extension described in the May 25, 2011 letter of intent, or negotiation between BP, CBRE and PRC. Rather, this delay was due to the need to resolve the "must-take" and "ROFO" encumbrances of the law firms, as well as PRC's slow pace, and the need to have the amendment approved by BP's lender. JX 243 at 24:10-14, 26:7-20. Chairman Goldway had to contact someone she knew at BP to ask BP to focus on completing the lease extension.[6]

---

[6]     Chairman Goldway testified:

And a light went on in my head and I said, my father's best friend's son is the senior vice president at Boston Properties in New York, I hadn't made the connection between that, and I said, I'll call him. And I called him. And with that personal call,

Furthermore, BP's Mr. Storrs noted that BP could not have asked one of the law firms to waive its rights before PRC signed the letter of intent, which had taken a long time.  JX 213.  Mr. Storrs also thought the delay was due to PRC moving slowly and the change in brokers.  JX 243 at 30:6-14.

PRC did not sign a written agreement with CBRE engaging CBRE as its broker until over a year after PRC terminated Meyer Group -- August 5, 2011 -- after the letter of intent was signed. JX 215.  This agreement authorized CBRE to "exclusively assist and represent PRC in any new lease or lease extension/lease restructuring discussions . . . ."  Id.  The agreement stated that CBRE's exclusive representation was for the period of November 1, 2010, to either the earlier of December 31, 2012, or the payment of a commission, unless terminated or extended by the mutual written agreement of the parties.  Id.  Either CBRE or PRC could terminate the agreement unilaterally upon 30 days written notice.  Id.

The agreement between PRC and CBRE also contained an indemnification provision, which stated:

> PRC warrants and represents that it has neither engaged, nor dealt with any other broker or finder other than CBRE with respect to PRC's office real estate requirement in Washington, D.C. referenced herein, and further warrants and represents that PRC has taken any steps it believes reasonable or necessary to terminate any representation agreement or brokerage agreement by and between PRC and The Meyer Group, Ltd. and/or William J. Meyer dated on or about May 5, 2004 prior to the Effective Date of this Agreement, and believes in good faith that neither The Meyer Group, Ltd., nor William J. Meyer, is entitled to any fees or commissions in connection with PRC's office real estate requirement in Washington, D.C. referenced herein.

> Notwithstanding the foregoing, PRC and CBRE acknowledge and agree that The Meyer Group, Ltd. and/or William J. Meyer might make a claim for compensation in connection with PRC's office real estate requirement in Washington, D.C. referenced herein, even though both parties reasonably believe that any such claim would be unwarranted and unfounded.  If The Meyer Group, Ltd and/or William J. Meyer and/or any other person or entity affiliated with The Meyer Group, Ltd. and/or William J. Meyer make(s) any claim against PRC and/or CBRE and/or any landlord with which PRC enters into a lease or lease extension in connection with PRC's office real estate requirement in Washington, D.C. referenced herein for which CBRE has been paid a Commission in connection therewith under the terms of this Agreement, then CBRE shall indemnify and hold PRC harmless from any and against any liability or damages (excluding attorney's fees and costs of defense) resulting from any such claim; provided, however, in no event shall CBRE be liable

_____

he then made sure that the office in Washington, D.C. started paying attention to our lease  negotiations and sitting down with the other attorneys and figuring out what they could arrange to get the other various law firms to give up space and for them to get their attorneys to work on this as a priority, et cetera.

Tr. 372:11-373:7 (Goldway).

for any amounts in excess of the amount of the Commission actually paid to and received by CBRE in connection with the transaction at issue. Notwithstanding the foregoing, PRC and CBRE acknowledge and agree that each party shall be responsible for its own defense of any such claim and any fees or costs, including any and all attorneys' fees, associated therewith.

JX 215 at 2-3.

Between June and December 2011, PRC and the landlord signed a set of five lease amendments that extended the Original Lease's termination date, in order to allow PRC to remain in the space until it executed the agreement extending the Original Lease. JX 210, 221-222, 224, 227. In November 2011, CBRE reported that according to Mr. Storrs, the Finnegan Henderson encumbrance was taken care of, but BP had been waiting for three weeks to hear about the Goodwin Procter "must-take" and expected results shortly. JX 223. After that, BP needed to get approval from its lender, JP Morgan. Id. In an email to Ms. Grove, dated December 21, 2011, Mr. Storrs stated that additional time was still needed to obtain BP/CRF's lender's approval of the lease extension. JX 226. The Seventh Amendment to the Original Lease was executed on January 13, 2012. JX 232.

The Seventh Amendment to the Original Lease covered the same space PRC was occupying and extended the term of the Original Lease to August 31, 2022. It also provided PRC with a construction allowance and a right of first offer on space on the 2nd floor and lists PRC's broker as CBRE. Id. A right of first offer was included in Meyer Group's draft proposal, which proposed that the landlord would give PRC the right of first refusal "on any contiguous space." JX 169. Meyer Group's draft counterproposal had also included a tenant improvement allowance of $70 per rentable square foot, and had similarly extended the Original Lease until two months earlier -- June 30, 2022. The proposal sent by Mr. Storrs to Mr. Meyer had proposed extending the Original Lease term to February 28, 2017, and did not include a construction allowance or the right of first offer on the second floor. See JX 131. Neither the Seventh Amendment to the Original Lease, nor BP's proposal, nor Meyer Group's counterproposal,[7] changed PRC's rented space within the building or the amount of PRC's rented square footage.

## Subleasing Bryan's Cave Fourth and Fifth Floor Space

During this time period, between May 15, 2011, and July 1, 2012, PRC also signed three subleases with Bryan Cave. The first sublease was signed on May 15, 2011, and was for 1,500 square feet on the fifth floor of the east tower of the Building. JSF ¶ 18; JX 207. The rental period ended on June 30, 2012. This sublease specifically provided that CBRE would receive a 3% commission paid by Bryan Cave and that PRC and Bryan Cave had not dealt with any other brokers other than Bryan Cave's broker, Jones Lang LaSalle ("JLL"), and CBRE. JX 207 at 12. Bryan Cave and PRC agreed to indemnify each other against claims "arising out of any dealings had by the indemnifying party with any broker other than JLL and CBRE." Id. at 12-13.

---

[7]     Meyer Group's draft counterproposal provided for 29,102 square feet on the second floor east and west Tower and included the draft comment "HOW DO WE CHANGE TO 35,000 SF?" JX 170 at 1.

The second Bryan Cave sublease was an amendment to the first sublease, and was signed on August 16, 2011.  JSF ¶ 23; JX 220.  The second Bryan Cave sublease gave PRC short-term (from August 16, 2011 to October 31, 2011) "swing space" on the fourth floor of the east side of the Building.  JX 220.  The second Bryan Cave sublease contained a similar indemnification provision, but stated that "[n]o commissions shall be payable in connection with this First Amendment."  Id. at 3.  The third Bryan Cave sublease was signed on July 1, 2012, and extended the rental period for the fifth floor space until March 29, 2015.  JSF ¶ 27; JX 235.  None of the Bryan Cave subleases or the Seventh Amendment to the Original Lease recognized Meyer Group as PRC's broker or provided that Meyer Group would receive commissions from these transactions.

## Work Performed by CBRE

Besides negotiating with BP regarding BP's April 1, 2011 counterproposal and the May 25, 2011 letter of intent for the Seventh Amendment to the Original lease, and the Bryan Cave subleases, CBRE performed additional real estate brokerage work for PRC.  CBRE represented PRC regarding the series of lease amendments that extended the Original Lease to accommodate PRC until the Seventh Amendment could be signed.  Tr. 407:11-18 (Grove).  CBRE also showed PRC additional properties.  Id. at 407:15-18.  In the end of 2011, CBRE helped PRC reconfigure its existing square footage to contain a larger number of offices, which involved obtaining a verbal commitment from BP that PRC could stay in the building, and arranging for BP to be the project manager for the reconfiguration construction.  Id. at 408:1-23.  CBRE also helped PRC look at options for leasing contiguous space, but the price was too high, and PRC decided instead to pursue the reconfiguration.  Id. at 407:19-25.  CBRE found PRC space on another floor of the building to occupy while the reconfiguration was taking place.  Id. at 409:2-4.

## Expert Testimony

Plaintiff's expert at trial was David Ellis Kaplan, the founder of Strategic Realty Advisors.  Tr. 214:10-24 (Kaplan).  Mr. Kaplan is an attorney and a licensed real estate broker in Washington, D.C., Maryland, and Virginia.  Id. at 214:25-215:1, 220:23-25.  Mr. Kaplan works 100% of the time on behalf of commercial office tenants and has worked in the commercial real estate field for 29 years.  Id. at 215:13-216:14.  Mr. Kaplan was admitted as an expert in commercial real estate lease transactions in the District of Columbia.  Id. at 225:18-21.  Mr. Kaplan testified that when there is an exclusive brokerage agreement, the broker signatory to that agreement is automatically the procuring cause of transactions he or she submitted to the client.  Id. at 241:6-10.

According to Mr. Kaplan, after a broker has been terminated by the tenant, the brokerage agreement's extension clause would permit the broker to receive a commission on a transaction he submitted for a reasonable period of time.  Mr. Kaplan defined such a reasonable period of time as the duration of the balance of the initial lease term, plus a year or two thereafter.  Id. at 244:5-245:17.  Here, the lease term had been extended through August 31, 2015, meaning that, in Mr. Kaplan's view, Meyer Group would be entitled to commissions for leases executed six or seven years after the Agreement was terminated in March 2010.  Furthermore, this temporal limitation would apply to any real estate service the broker provided within the building, including subleases and lease extensions, as long as the broker had originally "submitted" the building to his client, the tenant.  Id. at 246:21-247:9.

Mr. Kaplan testified that typically, the landlord or landlord's agent pays the tenant's broker's commission, which is calculated as a percentage of the gross value of the lease over the entire lease term. Id. at 228:19-229:8. According to Mr. Kaplan, 3 to 4 % was the market rate for a broker commission in 2012. Id. at 229:9-15. Mr. Kaplan opined that tenant brokers' relationships with their clients do not terminate upon the signing of a lease by the client, based upon his experience. Id. at 232:7-24. In Mr. Kaplan's opinion, the language "submitted" or "presented" in brokerage agreement is broad and "might be as modest a step as including [a] building in a survey, it might be a building that you toured, it might be a building that you negotiated on, but it's very broad. Anything that was in that -- any survey that you provided to your tenant, or discussed in emails, would qualify as being submitted." Id. at 235:7-12. Mr. Kaplan further opined that forwarding a landlord's proposal to a client would constitute "submitting a property." Id. at 235:11-18.

On cross-examination, Mr. Kaplan stated that the language in the Agreement was typical in the real estate industry. However, he acknowledged that the Agreement was the only agreement he had seen over the course of his 29-year career that paired very broad "submitted" language with no stated temporal limitation governing how long after termination a commission could be received for work done pre-termination. Id. at 272:21-273:6. Mr. Kaplan also acknowledged that his own form brokerage agreement includes a temporal limitation, but he did not identify what that limitation is. Id. at 273:13-19.

Defendant's expert, James Warkentin, has been a real estate broker for 45 years and holds the exclusive Counselor of Real Estate designation from the National Association of Realtors. Tr. 424:24-425:15 (Warkentin). Mr. Warkentin is currently licensed in Virginia and was formerly licensed in Washington, D.C. and Maryland. Id. at 425:16-19. Mr. Warkentin has also been quoted or interviewed by numerous publications, such as "Fortune, Money Magazine, New York Times, Wall Street Journal, Washington Post, the old Washington Star, [and] Kiplinger Newsletter," and has done numerous speeches and seminars. Id. at 425:20-426:23.

Mr. Warkentin's area of specialty is residential real estate and commercial investment work. Id. at 436:16-21. In the course of his career, he has negotiated fewer than a dozen commercial office leases and none for tenants. Id. at 439:7-12. Mr. Warkentin does not consider himself an expert in commercial real estate transactions in the District of Columbia, and his basis for stating expert opinions about the instant transaction was based upon conversations he had with other brokers. Id. at 439:13-441-9. The Court asked Mr. Warkentin what in his background, education or experience qualified him to be an expert in general commercial real estate brokerage agreements in the District of Columbia. Id. at 449:24-450:22. Mr. Warkentin answered that having taught a seminar called "Innovative Fee Techniques" about how to create an agreement with a client 15 times, having had five weeks of specialized coursework from 1977-1983, while studying for a Certified Commercial Investment Member degree,[8] and having written his own agreements for commercial investment work in Northern Virginia provided him such expertise. Id. at 450:23-451:25. In terms of the "representation" aspect, he discussed work he had done assembling partnerships for commercial investment.

---

[8]     Mr. Warkentin completed all coursework for this degree, but did not receive this degree. Tr. 446:14-20.

After conducting voir dire, Plaintiff objected to Mr. Warkentin's qualification as an expert, arguing that he had "no stated experience in commercial lease transactions in the District of Columbia . . . ." Id. at 441:13-18.  Defendant's counsel represented that it had been "a Herculean task" to locate a Washington, D.C. tenant representative willing to testify against another Washington, D.C. tenant representative, and Plaintiff's counsel did not dispute this.  Tr. 444:16-445:1.  Neither party elicited testimony from the experts contradicting this difficulty in locating experts.

Based upon Mr. Warkentin's candor, demeanor, and longstanding experience in local real estate, and his repeated teaching of a seminar on creating agreements, as well as the apparent difficulty in retaining opposing experts in this arena, the Court determined it would be helpful to hear Mr. Warkentin's views.  Ultimately, the Court admitted Mr. Warkentin as an expert in commercial real estate brokerage agreements and representation in the Washington, D.C. metropolitan area.

Mr. Warkentin testified that a month-to-month exclusive commercial real estate brokerage agreement that "goes on forever" would be an abusive agreement and that District of Columbia regulations impose a 90-day termination date, in a scenario where no termination date is set forth in such an agreement. Id. at 462:8-14.  According to Mr. Warkentin, a 6-to-12 month performance protection period, which is how he referred to an extension clause, is "quite customary" and balances the broker's and client's interests. Id. at 465:15-466:5. However, he stated that "[t]here may be circumstances where a year or even two years would be reasonable," but he found it difficult to think of any. Id.

Mr. Warkentin also discussed how brokerage is a risk-filled business and that each broker decides how much risk to take on. Id. at 499:6-14. According to Mr. Warkentin, making the term of the lease the broker's performance protection period would force the tenant to either continue to work with a broker that it no longer wanted or pay twice the brokerage costs when it completes its next lease, which "denie[s] [tenants] the economic freedom to choose other representation unless they endure significant costs." Id. at 469:8-470:6. Mr. Warkentin found it troubling for a brokerage agreement to define the broker as the procuring cause for any property submitted to the client. Id. at 479:10-18.  In Mr. Warkentin's view, it would "put the client" in an "exquisitely tight, uncomfortable, unreasonable box" to have an agreement with a broad submission paragraph, an indefinite performance protection period, and a provision equating submission with procuring cause. Id. Mr. Warkentin explained "submission" as "introduc[ing] a client to a property that they were otherwise unaware of" and "creat[ing] a value" in this way. Id. at 478:16-18. Mr. Warkentin testified that it was "troubling to claim submission of the property the client's already in" because the broker could not "tell them about it new" and was not "bringing value." Id. at 478:21-23.

Mr. Kaplan and Mr. Warkentin agreed on certain issues.  Mr. Warkentin agreed with Mr. Kaplan's report that each of the leased spaces in the Building was submitted to PRC "as that term is commonly used in the context of real estate brokerage agreements."[9] Id. at 504:4-505:13. Mr. Warkentin and Mr. Kaplan also agreed that further procuring cause analysis is not required when a brokerage agreement has an extension clause that provides that a broker only has to "submit" a property to be entitled to a commission.  They also agreed that a procuring cause analysis is not

---

[9]        Neither expert's report is in the record.

necessary when the agreement defines the broker as the procuring cause of the transaction. Mr. Kaplan stated that, "[i]f procuring cause is defined in the agreement, [. . .], then by definition, the first broker would be procuring cause under the terms of the agreement and under the extension clause." Tr. 327:15-18 (Kaplan).   Finally, both experts also agreed that the language of the brokerage agreement controls and would determine when the agreement ends.   Compare Tr. 291:15-25 (Kaplan) with Tr. 506:12-16 (Warkentin).

## Discussion

### Jurisdiction

The Court has jurisdiction over this case.  The Tucker Act provides, in relevant part, that "[t]he Court of Federal Claims shall have jurisdiction to render judgment upon any claim by or against, or dispute with, a contractor arising under section 10(a)(1) of the Contract Disputes Act of 1978, including a dispute concerning termination of a contract . . . ." 28 U.S.C. § 1491(a)(2) (2012).[10]

### Defendant's Motion to Strike Plaintiff's Exhibit 2

Defendant moves to strike Plaintiff's Exhibit 2, a memorandum to "files" from "R.A. Oliver" of PRC dated October 2, 2009. PX 2.[11]  The memorandum indicates that a telephone conference between "PRC representatives Shoshana Grove, Judy Grady, and Rich Oliver and Postal Service Representatives Mike Wolfe and Bill Ambrose" was held on September 30, 2009. Id.  During this conference, "the advisability of, and procedures for, investigating the acquisition of new office space" and "the issues surrounding the plumbing problem that affected the Commissioners' [offices]" were discussed.  Id. The document indicated that PRC was considering investigating new space with "possible assistance from real estate professionals available from or through the Postal Service . . . ."  Id.  At trial, the only testimony regarding this exhibit was from Ms. Grove, who confirmed that Plaintiff's Exhibit 2 appeared to be an internal PRC memorandum, that the conference occurred, and that "the primary focus" was the plumbing issue, as well as a desire to establish a "relationship of support" between herself and facilities officers at the Postal Service. Tr. 138:18-140:14 (Grove).  Plaintiff's counsel asked Ms. Grove about the memorandum, but she did not adopt its contents or explain who Mr. Oliver was.  See id.

Defendant argues that this exhibit is hearsay and is not admissible based on Ms. Grove's testimony.  Def. Mot. to Strike 3. Plaintiff counters that the memorandum itself states that Mr.

---

[10]     Plaintiff asserts that it submitted a certified claim pursuant to the CDA to Ms. Grove on May 3, 2012.  Am. Compl. ¶ 2.  Defendant has not argued that Plaintiff failed to properly submit a claim pursuant to the CDA.

[11]     At the conclusion of Plaintiff's case, Plaintiff attempted to move into evidence Plaintiff's Exhibits 1-7. Tr. 328:24-329:5.  Plaintiff then withdrew the request with respect to Exhibits 1, 3, 6, and 7.  Plaintiff's Exhibit 8 was not offered into evidence.  The Court admitted Plaintiff's Exhibits 2, 4, and 5, but stated that Defendant could file a motion to strike after reviewing the transcript.  Id. at 332:2-5.  Defendant filed this motion to strike, and Plaintiff does not oppose Defendant's motion with regard to Plaintiff's Exhibits 4 and 5.  Therefore, only Plaintiff's Exhibit 2 is at issue.

Oliver was a PRC representative and it qualifies as the statement of a party opponent.  Pl. Opp'n to Mot. to Strike 2-3.

Federal Rule of Evidence ("FRE") 801 defines hearsay as a statement made by a declarant that is not made while testifying at the current trial or hearing and is introduced for the truth of the matter asserted in the statement.  Fed. R. Evid. 801(c).  An opposing party's statement is not hearsay and is defined in FRE 801(d)(2) as a statement "offered against an opposing party" and:

> (A) was made by the party in an individual or representative capacity;

> (B) is one the party manifested that it adopted or believed to be true;

> (C) was made by a person whom the party authorized to make a statement on the subject;

> (D) was made by the party's agent or employee on a matter within the scope of that relationship and while it existed; or

> (E) was made by the party's coconspirator during and in furtherance of the conspiracy.

> The statement must be considered but does not by itself establish the declarant's authority under (C); the existence or scope of the relationship under (D); or the existence of the conspiracy or participation in it under (E).

Id. at 801(d)(2).  Plaintiff invokes Rule 801(d)(2)(A) in its response to Defendant's motion.  However, Rule 801(d)(2)(A) governs statements offered against a party made by the party individually or while representing another.  See, e.g., United States v. Matlock, 415 U.S. 164, 172 n. 8 (1974) (stating that Rule 801(d)(2)(A) "expressly provides that a party's own statements offered against him at trial are not hearsay.").  In the instant case, Mr. Oliver is not a party to this action, and his memorandum is not being offered as evidence against him as a litigant.

As a representative of PRC, any statements made by Mr. Oliver are covered by Rule 801(d)(2)(D).  In order to be admissible under Rule 801(d)(2)(D), the statement must be offered against a party and be "made by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."  Rodriguez v. United States, 69 Fed. Cl. 487, 493 n. 8 (2006).  The foundation for admission of a statement under Rule 801(d)(2)(D) requires evidence of the agency or authority in addition to the statement itself.  E.g. United States v. Docampo, 573 F.3d 1091, 1097 (11th Cir. 2009).  Here, there was no testimony as to what Mr. Oliver's role was at PRC, and the scope of his employment is unknown.  Plaintiff's Exhibit 2 is therefore not admissible under Rule 801(d)(2)(D).  Defendant's motion to strike Plaintiff's Exhibit 2 is granted.

**Is Meyer Group Entitled to Commissions On Locations It Claims to Have Submitted to PRC Prior to the Termination of Its Exclusive Brokerage Agreement?**

This is a highly unusual case.  A Government agency entered into an exclusive real estate brokerage agreement without negotiating the Agreement or changing one word of the broker's proposed contractual language.  As a result, the Agreement at issue contains language quite

favorable to Meyer Group.  Nonetheless, as the parties acknowledge, the Agreement is a binding contract.

When the United States is a party to a contract, the Court still applies the general  rules of contract construction applicable in the commercial area. E.g., C.R. Pittman Constr. Co. v. United States, 92 Fed. Cl. 20, 25 (2010).  "It is well settled that, in disputes involving contract interpretation, courts begin 'by examining the plain language of the contract.'" Canal 66 P'ship v. United States, 87 Fed. Cl. 722, 725 (2009) (quoting M.A. Mortenson Co. v. Brownlee, 363 F.3d 1203, 1206 (Fed. Cir. 2004)). Where the language of the contract is clear and unambiguous, "the words of those provisions must be given their plain and ordinary meaning by the court in defining the rights and obligations of the parties." George Hyman Constr. Co. v. United States, 832 F.2d 574, 579 (Fed. Cir. 1987) (internal quotation omitted). The Court may not resort to extrinsic evidence to interpret unambiguous provisions.  See McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996). The Court uses an objective test, applying the "'meaning that would be derived from the contract by a reasonably intelligent person acquainted with the contemporaneous circumstances.'"  Canal 66 P'ship, 87 Fed. Cl. at 725 (quoting Metric Constructors, Inc. v. NASA, 169 F.3d 747, 752 (Fed. Cir. 1999)).

Courts seek an interpretation of a contract that gives effect to all its terms and leaves no provision meaningless.  See United States v. Johnson Controls, Inc., 713 F.2d 1541, 1555 (Fed. Cir. 1983).  A contract should be interpreted in such a way that all parts make sense.  Id.  Finally, "[w]here specific and general terms in a contract are in conflict, those which relate to a particular matter control over the more general language."  Hughes Commc'ns Galaxy, Inc. v. United States, 998 F.2d 953, 958 (Fed. Cir. 1993) (quoting Hills Materials Co. v. Rice, 982 F.2d 514, 517 (Fed. Cir. 1992)).

## The Agreement Did Not Terminate Upon Signing of the Initial Lease

At the outset, Defendant offers a strained argument that the language of the Agreement demonstrates that its purpose was for a single lease and commission and that it terminated upon the signing of the Original Lease in April 2005.  Def. Post-Trial Br. 71-74.  This would mean that Meyer Group is not entitled to any commissions beyond that it already received for securing the initial lease.  Defendant focuses on the Agreement's use of the singular and points to references in the Agreement it asserts demonstrate that the Agreement was for a single transaction -- the Agreement's use of the words "a lease" twice, "the lease" twice, "a location," "the commission," "its commission," "in the said transaction," and "a lease agreement" obligating the landlord to pay "a commission" in "the lease agreement."  Id. at 73; JX 27.  Defendant contends that these "general provisions" should be read in concert with the "specific provision" of the extension clause.  In Defendant's view, the "general provisions" should be read to terminate the Agreement when the single initial lease "transaction" was completed and the "specific termination provision" should operate to terminate the Agreement "in situations where 12 months have passed, performance is not complete, and PRC wishes to terminate."   Id. at 73-74.

Plaintiff counters that under its plain meaning, after the initial 12-month term, the Agreement continued on a month-to-month basis and did not automatically terminate after the signing of the Original Lease.  Pl. Post-Trial Br. 52.  Plaintiff also highlights language in the Agreement that contemplates an ongoing relationship and focuses on Mr. Kaplan's testimony that

brokerage agreements define their duration by their own terms, and do not typically terminate upon the signing of a lease.  Id. at 52-53.

In this Court's view, the unambiguous language of the Agreement provides that this contract was effective for 12 months and then continued month-to-month until terminated in writing.  JX 27.  Rather than defining duration as Defendant suggests in terms of the number of transactions or leases Meyer Group was retained to procure, the Agreement defined duration in terms of time.  Defendant's position that the Agreement terminated automatically on April 7, 2005, when the Original Lease was signed, conflicts with the Agreement's clear continuation language and would make the written termination notice requirement meaningless.  While the Agreement refers to "transaction," "lease," etc. several times in the singular, the termination provision does not state that the Agreement would terminate upon completion of a single transaction, and the Court will not read such a limitation into the text.  The use of the singular "lease" or "transaction" throughout the Agreement does not create an otherwise unmentioned restriction that this Agreement would only cover a single lease transaction.

Defendant's attempt to impose this single-transaction limitation as the linchpin of the Agreement is at odds with the overarching premise of this exclusive real estate brokerage agreement.  The key obligations PRC undertook were to advise the landlord of Meyer Group's representation of PRC "before entering in to any lease agreement" and to require, as a condition of entering into a lease agreement, that the landlord undertake an obligation to pay a commission to Meyer Group.  JX 27 (emphasis added).  These contractual obligations apply to any lease transaction, not just one.

In addition, the extension clause specified that Meyer Group could, as PRC's exclusive broker, work to secure other future lease transactions for PRC prior to termination of the Agreement.  In this clause, PRC expressly agreed:

> Subsequent to the expiration or termination of this agreement, we will continue to recognize The Meyer Group, Ltd. as our exclusive broker and the procuring cause in accordance with the provisions hereof, with respect to any prospective locations that have been submitted by The Meyer Group, Ltd. during the term of this agreement. In addition, The Meyer Group, Ltd. will have thirty (30) days after expiration or termination of this agreement to provide to us a list of those prospective locations submitted to us during the term of this agreement.

JX 27 at 2.

This provision would clearly contradict Defendant's proposed construction that the Agreement abruptly ended upon consummation of a single initial lease.  Furthermore, Meyer Group promised to "use its best efforts to secure a location or locations satisfactory to us" and in return, PRC promised to "cooperate with [Meyer Group] in good faith in [Meyer Group's] efforts to secure satisfactory premises and to maintain this relationship." (emphasis added).  Id. at 1.

In sum, the language of the Agreement indicates that this relationship between PRC and Meyer Group would be ongoing after the initial lease was signed.  This interpretation gives effect to all parts of the Agreement.  The Court concludes as a matter of law that the Agreement did not

terminate upon execution of the Original Lease in April 2005, but continued to be in effect until PRC terminated the Agreement on March 29, 2010.[12]

### The Agreement, Not a "Procuring Cause" Analysis, Governs Whether Meyer Group is Entitled to Commissions

Defendant argues that it is contrary to law for the Agreement to define Meyer Group as the procuring cause because it would be a "fabrication" for the Court to recognize Meyer Group as the procuring cause based upon its submission of property when CBRE was the real procuring cause. Def. Post-Trial Reply Br. 30.[13]  Defendant asserts that recognizing Meyer Group as the procuring cause would be "deceitful," "patently untrue," and would force "an independent commission of the United States to misrepresent the extent of its relationship with its former broker."  Def. Post-Trial Reply Br. at 30; Def. Post-Trial Br. 95.  Acknowledging that Meyer Group was PRC's broker and a procuring cause of two transactions is not a misrepresentation or fabrication, but a legal conclusion based upon the clear language of the Agreement that PRC, a sophisticated party signed. The Agreement defined Meyer Group as PRC's exclusive broker.  Ms. Grove acknowledged that Meyer Group was performing "real estate brokerage services." JX 172. Importantly, BP, the landlord with whom Meyer Group was negotiating on PRC's behalf, clearly recognized Mr. Meyer was acting as PRC's real estate broker as of the January 7, 2010 lease extension proposal.  So too, until PRC's personnel changed in 2009, the evidence strongly shows that PRC's executives, Mr. Williams, Mr. Sikora, and Ms. Grady, thought of Mr. Meyer as PRC's real estate broker and treated him as such by communicating with him about different leasing options, allowing him to take them on tours, and calling him PRC's broker.  The fact that miscommunications and disorganized records prevented PRC's new leadership -- Ms. Grove and Chairman Goldway -- from learning about the Agreement does not negate its existence or relegate its terms to a "fabrication."

Additionally, even after PRC's management changed, Meyer Group performed the following tasks as PRC's exclusive real estate broker:

- Met with Ms. Grove on November 24, 2009.  JX 97, 99.

- Performed a free lease audit.  JX 106.

---

[12]     In Count II of the amended complaint, Plaintiff alleged, in the alternative, that PRC breached an implied-in-fact contract.  Because the Court concludes that the Agreement continued through March 29, 2010, and that its extension clause governs Meyer Group's entitlement to any post-termination commissions, there can be no implied-in-fact contract covering this same subject matter.  Atlas Corp. v. United States, 895 F.2d 745, 754-755 (Fed. Cir. 1990) ("The existence of an express contract precludes the existence of an implied contract dealing with the same subject, unless the implied contract is entirely unrelated to the express contract.").

[13]     Mr. Warkentin explained the concept of procuring cause as the broker who did more than any other competing broker. Tr. 310:20-24 (Warkentin).  He also testified that defining the procuring cause is a two-step process, involving a determination of which broker brought the client to a place where it would make a decision and which broker started an unbroken chain of events that culminated in the transaction.  Id. 472:19-473:9.

- Fielded inquiries from Ms. Grove about plumbing problems, contacted Mr. Magellan about these issues, and raised them with Mr. Storrs several times.  JX 113, 115, 121, 125-130.

- Fielded a request from Ms. Grove in December 2009 to discuss exploring other lease options in January.  JX 124.

- Dealt with a request from Ms. Grove, on January 12, 2010, to lay out a schedule for future building tours.  JX 139.

- Met with Ms. Grove on January 14, 2010, and January 15, 2010, to prepare for seven upcoming building tours.  JX 140-141,143.

- Provided PRC with a market survey and financial analysis in January 2010.  JX 141.

- Went on tours with PRC personnel on January 20, 2010.  JX 145.

- Followed up with Ms. Grove about the tours on January 30, 2010.  JX 151.

- Met with Ms. Grove to discuss another building tour on February 25, 2010.  JX 161.

Defendant brushes aside the Agreement PRC signed and cites cases holding that a broker must be the procuring cause of a transaction in order to obtain a commission from it.  Def. Post-Trial Br. 90-91; Def. Post-Trial Reply Br. 29.  However, it is settled law that when a brokerage agreement sets forth what actions a broker must take to be entitled to a commission, the terms of that agreement override any procuring cause analysis.  In Aerotronics, Inc. v. Pneumo Abex Corporation, the Eighth Circuit held that the procuring cause doctrine is limited by terms of the contract and cannot "be used to supplant or contradict the terms of a contract entered into between parties." 62 F.3d 1053, 1064 (8th Cir. 1995).  Several cases cited by Defendant also reject the very argument Defendant makes about procuring cause.  See Messick v. Powell, 236 S.W.2d 897 (Ky. 1951); Gala v. Susnjar, 91 N.W.2d 885 (Mich. 1958); Nichols v. Pendley, 331 S.W.2d 673 (Mo. Ct. App. 1960); Clients' Serv., Inc. v. Pupo, 430 P.2d 552 (Wash. 1967); Kaye v. Coughlin, 443 S.W.2d 612 (Tex. App. 1969); Hyde Park-Lake Park, Inc. v. Tuscon Realty & Trust Co., 500 P.2d 1128 (Ariz. Ct. App. 1972); Nollner v. Thomas, 533 P.2d 478 (Nev. 1975).  In all these cases, clients attempted to argue that their former brokers were not the procuring cause of the transactions, but the courts held that the parties' contractual language controlled.  Here, the extension clause stated that Meyer Group would be recognized as the exclusive broker and procuring cause after termination "with respect to any prospective locations that have been submitted  by [Meyer Group] during the term of this agreement."  JX 27 at 2.  Thus, for any location submitted by Meyer Group during the life of the Agreement, which continued until March 29, 2010, the contractual language, not a post-hoc procuring cause analysis, controls.

**Meyer Group "Submitted" the Lease Extension Location and the Fifth Floor Bryan Cave Sublease to PRC**

The Agreement required PRC to recognize Meyer Group as its exclusive broker and procuring cause "with respect to any prospective locations that have been submitted by [Meyer Group] during the term of this agreement." JX 27 at 2.

Mr. Kaplan defined submission as:

It might be as modest a step as including a building in a survey, it might be a building that you toured, it might be a building that you negotiated on, but it's very broad. Anything that was in that -- any survey that you provided to your tenant, or discussed in emails, would qualify as being submitted.

Tr. 235:7-12 (Kaplan). In his testimony, Mr. Kaplan further stated that in his view and, he thought, industry-wide, "when you talk about a building submitted or presented to a tenant, it -- or a property, it refers to the building, it doesn't necessarily mean that you have to show them that particular space." Id. 246:25-247:4. Defendant's expert, Mr. Warkentin, testified that a variety of activities would constitute a submission, including touring a property, identifying a property in a market survey, and "possibly" transmitting a proposal from a landlord. Tr. 502:18-503:12 (Warkentin). Mr. Warkentin agreed with Mr. Kaplan's opinion that Meyer Group submitted to PRC each of the spaces PRC ultimately leased in the Building. Id. at 504:4-505:13.

**Submission of the Seventh Amendment to the Original Lease**

Based on the evidence in this case, Meyer Group submitted the location in the Seventh Amendment to the Original Lease to PRC. Meyer Group made PRC aware of the option of extending its lease and did additional work on the lease extension. Specifically, Meyer Group:

- Introduced PRC to the Building, procured the original lease, and assisted PRC with tenant issues during that lease.

- Met with Chairman Goldway and Ms. Grove in September 2009 to get them up to speed on PRC's situation in 901 New York Ave, NW and on the status of other buildings PRC was considering for future leasing. Tr. 58:10-25 (Meyer).

- Received a proposal for a lease extension from the landlord's representative in the Building, Mr. Storrs, on January 7, 2010, forwarded it to Ms. Grove, and suggested they meet to discuss it. JX 131.

- Negotiated with Mr. Storrs about the lease extension proposal for leasing the same space in the Building. JX 146.

- On March 2, 2010, discussed the January 7, 2010 lease extension proposal with Mr. Storrs, including PRC's desire for a longer lease term and tenant improvement funds. JX 162.

- Drafted a counterproposal to respond to Mr. Storrs' January 7, 2010 proposal. JX 170.

**Submission of the Fifth Floor Bryan Cave Sublease**

The Bryan Cave subleases were for space on the fourth and fifth floors of the Building. JSF ¶¶ 18, 23, 27.[14]  The first sublease was for 1,500 square feet of space on the fifth floor, while the second sublease amended the first to add short-term space on the fourth floor.  The third sublease amended the first to extend the time PRC was leasing the fifth floor space and altered the rent terms.

On June 16, 2009, Mr. Meyer emailed a Powell Goldstein broker stating, "I met with the Postal Regulatory folks. Can you carve out a small suite somewhere for sublease?"  JX 74 at 1. Mr. Meyer also sent an email to a CBRE broker that he "needed a small suite for my client the Postal Regulatory Commission. 1,500-2000 feet. Right away.  Know of anything else in the area of 901 new york let me know."  JX 77.  The purpose of this search was to find space for PRC's Inspector General's office.  JX 78 at 1.

On June 29, 2009, Mr. Meyer emailed PRC's Ms. Grady stating "[t]here is space that Brian [sic] Cave is willing to subdivide for you upstairs."  JX 81 at 2.  Mr. Meyer then sent Ms. Grady a diagram of the fifth floor east tower of 901 New York, Ave, NW and noted that he had circled the location Bryan Cave was willing to subdivide.  JX 82.  On June 30, 2009, Mr. Meyer emailed Bryan Cave's broker and asked "[i]s there a way for the Postal Regulatory people to see the proposed space today. Maybe around noontime.?"  JX 83.  A tour of this space may have taken place on July 1, 2009, as the record contains emails between Ms. Grady, Mr. Meyer, and the Bryan Cave broker arranging a time to meet, and ending with Mr. Meyer asking Ms. Grady if she connected with the Bryan Cave broker.  Id.; JX 84.

As Meyer Group specifically presented PRC with the option of subleasing Bryan Cave space in the 5th floor east tower, the Court finds that he "submitted" this location within the meaning of the Agreement.

However, there is no indication in the record that Meyer Group introduced or otherwise submitted the fourth floor swing space to PRC beyond touring these spaces in December 2008. See Pl. Post-Trial Br. 57-58.  PRC's need for the space on the fourth floor arose because of construction work in PRC's other space in 2011, which occurred well after Meyer Group's Agreement was terminated.  JSF ¶ 23.  The purpose of Meyer Group's showing of the fourth floor space to PRC -- back in 2008-2009, when it was first interested in the third floor -- was not prompted by this construction.  Meyer Group's submission in 2008-2009 bore no relationship with what became the sublease that was entered into in 2011, for the fourth floor space.

The case of Lloyd Hammerstad, Inc. v. Saunders is instructive here. 495 P.2d 349 (Wash. App. 1972).  In that case, the eventual purchasers were a husband and wife. The broker drove the husband to a number of residences in their search for a new home, including the one at issue, and stopped in front of it on the street.  Id. at 350. When the husband heard the price, he told the broker to drive on because it was too expensive.  Id. The wife later visited the house as part of a social call, and, unaware that her husband had already viewed it, found out that it was for sale and encouraged her husband to come see it.  Id.  They later purchased this property, and the broker

---

[14]     Bryan Cave merged with Powell Goldstein on January 1, 2009, so the space was originally referred to as the Powell Goldstein space.  AJSF ¶ 37.

who had worked with the husband had no involvement in that transaction. Id. The Court of Appeals of Washington analyzed the case of Clients' Service, Inc. v. Pupo, which had held that while a broker with an agreement did not need to be the procuring cause of a transaction, there still had to be "some minimal causal relationship between the activities of the broker during the listing period and the ultimate sale." Id. at 350-351 (citing Clients' Serv. Inc. v. Pupo, 430 P.2d 552 (1967)). The Court of Appeals in Lloyd Hammerstad rejected the broker's claim for a commission because she had not had a "minimal causal relationship" between the wife's discovery of the property and the sale after the husband had rejected the location.

Here, as in Lloyd Hammerstad, there is no "minimal causal relationship" between the activities of Meyer Group during its employment as PRC's exclusive real estate broker and the later subleasing of the fourth floor swing space.

**The Extension Clause Applies to the Seventh Amendment and the Fifth Floor Sublease**

Even though the Agreement was in effect through March 29, 2010, and Meyer Group "submitted" both the Seventh Amendment to the Original Lease location to PRC and the fifth floor location of the first and third Bryan Cave subleases, there is another potential legal impediment to awarding Meyer Group damages for the Seventh Amendment to the Original Lease and the first Bryan Cave fifth-floor sublease – these transactions were not effected until well over a year after the Agreement was terminated. The Seventh Amendment was not executed until January 13, 2012 – 655 days, or one year and nine months, after Meyer Group's Agreement was terminated, and the first Bryan Cave fifth floor sublease was executed on May 15, 2011 – 412 days, or one year and 47 days, after termination. The delay in the consummation of these transactions presents a thorny legal issue, even with contract language as favorable as what Meyer Group wrote for itself with PRC's full acquiescence.

The Agreement provided no time limit on how long the broker would be entitled to a commission for properties he had submitted before the Agreement was terminated. In other words, theoretically, Meyer Group could be entitled to a commission no matter when a lease was eventually executed even if it were years after a property was submitted. The law does not favor such indefinite contract provisions, and, as precedent dictates and the experts here agree, the Court is forced to impose a "reasonable" term.

The Extension Clause provides:

Subsequent to the expiration or termination of this agreement, we will continue to recognize The Meyer Group, Ltd. as our exclusive broker and the procuring cause in accordance with the provisions hereof, with respect to any prospective locations that have been submitted by The Meyer Group, Ltd. during the term of this agreement. In addition, The Meyer Group, Ltd. will have thirty (30) days after expiration or termination of this agreement to provide to us a list of those prospective locations submitted to us during the term of this agreement.

JX 27 at 2.

Defendant argues that D.C. Code § 42-1703(g)(2) governs the Agreement and imposes a 90-day limitation to the extension clause, that the extension clause is ambiguous and must be construed against the drafter, Meyer Group, and that if this District of Columbia 90-day limitation

does not apply, a reasonable time of 6 to 12 months must be used.  Def. Post-Trial Br. 79, 83-90. The Court addresses these arguments in turn.

## The D.C. Code Does Not Apply

Defendant argues that D.C. Code § 42-1703(g)(2) limits the extension clause to 90 days because the Agreement does not specify a termination date.  Id. at 79.

D.C. Code § 42-1703(g) states:

(1) The brokerage relationships set forth in this section shall commence at the time that a client engages a licensee and shall continue until (A) completion of performance in accordance with the brokerage relationship, or (B) the earlier of (i) any date of expiration agreed upon by the parties as part of the brokerage relationship or in any amendments thereto, (ii) any mutually agreed upon termination of the relationship, (iii) a default by any party under the terms of the brokerage relationship, or (iv) a termination as set forth in subsection (i)(4) of this section.

(2) Brokerage relationships shall have a definite termination date; however, if a brokerage relationship does not specify a definite termination date, the brokerage relationship shall terminate 90 days after the date the brokerage relationship was entered into.

(3) Except as otherwise agreed to in writing, a licensee owes no further duties to a client after termination, expiration, or completion of performance of the brokerage relationship, except to account for all moneys and property relating to the brokerage relationship, and keep confidential all personal and financial information received from the client during the course of the brokerage relationship and any other information that the client requests during the brokerage relationship be maintained confidential, unless otherwise provided by law or the client consents in writing to the release of such information.

D.C. Code § 42-1703(g) (2012).

The D.C. Code does not govern this situation.[15]  When a brokerage agreement does not have a "definite termination date," the D.C. Code provides that the agreement ends in 90 days. However, the Agreement here does define a termination date, and there is no dispute that the termination date here was March 29, 2010.  The Agreement specifically provided that it was "effective for a period of twelve (12) months" and would "continue on a calendar month-to-month basis thereafter unless The Meyer Group, Ltd. receives written notice to the contrary."  JX 27 at 1.  Because the Agreement did not lack a definite termination date, there is no basis for the Court to turn to the D.C. Code to impose a 90-day limitation.  D.C. Code § 42-1703(g)(1) also permits brokerage agreements to end by "any mutually agreed upon termination of the relationship." Finally, § 42-1703(g)(3) specifically uses the phrase "[e]xcept as otherwise agreed to in writing," permitting parties to craft their own extension clauses with varying obligations for each party after

---

[15]    Given that the cited D.C. Code provisions are inapposite, the Court need not resolve whether this provision of local District of Columbia law applies in the federal procurement context.

termination.  Therefore, even if the D.C. Code applied, it would not alter the conclusion that the parties' Agreement controls.

**The Extension Clause is Not Ambiguous**

Defendant argues that the Court should adopt its construction of the extension clause because "[t]he application of PRC's commitment in perpetuity to its broker relationship with Meyer Group is ambiguous." Def. Post-Trial Br. 89.  Defendant thus urges the Court to employ the doctrine of <u>contra proferentem</u> and construe any ambiguities in the contract against the drafter. <u>Id.</u>

The Federal Circuit addressed a similar issue in <u>American Western Corporation v. United States</u>. 730 F.2d 1486 (Fed. Cir. 1984).  In that case, the Federal Circuit found that there was no ambiguity in a contract that "very clearly state[d] the relative rights of the parties" but "merely fail[ed] to set a time limit within which the Government must claim a reduction in price. Omission of an express time provision does not of itself create an ambiguity." <u>Id.</u>  Here, as in <u>American Western Corporation</u>, the omission of an express time limit specifying how long after termination PRC must continue to recognize Meyer Group as its broker "does not of itself create an ambiguity" warranting application of the <u>contra proferentem</u> doctrine.

**A Reasonable Temporal Limit Covers These Two Transactions**

The Court must determine whether the extension clause should be read to entitle Meyer Group to commissions for the first Bryan Cave sublease, entered into 412 days after the Agreement was terminated, and the Seventh Amendment to the Original lease, entered into 655 days after the Agreement was terminated.  Plaintiff argues that the extension clause continues through the termination date of the original lease and for a year or two thereafter, based on Mr. Kaplan's testimony.  On the other hand, Defendant argues that a 6-12 month period after termination is reasonable. [16]

The Federal Circuit has held that in the absence of an express time provision in a contract, it is common for courts to imply a reasonable time.  <u>See</u> <u>Am. W. Corp.</u>, 730 F.2d at 1488 (citing <u>Nager Elec. Co., Inc. v. United States</u>, 177 Ct. Cl. 234 (1966); <u>Roberts v. United States</u>, 174 Ct. Cl. 940 (1966); <u>Merritt-Chapman & Scott Corp. v. United States</u>, 174 Ct. Cl. 250 (1966)).  The parties have not provided any analogous cases defining what a reasonable time limitation in a brokerage agreement's extension clause should be.  This appears to be a case of first impression for this Court.  Based on the unusual facts of the instant case, the Court finds that this lease extension, signed 655 days after Meyer Group's termination, occurred within a reasonable period of time.  The uncontroverted evidence weighing in favor of this finding shows that the terms of the lease extension were finalized no later than May 25, 2011, in the parties' letter of intent, a year and two months after termination. PRC accepted the Seventh Amendment to the Original Lease

---

[16]    The Court does not find persuasive Defendant's argument that the "vast majority" of brokerage contracts have extension clauses that are 12 months or less. Def. Post-Trial Br. 83. These cases concern extension clauses with deadlines written by the parties and the length of the extension clause represents the parties' negotiated agreements, not a rule of law.

by signing the letter of intent.  JX 243 at 56:9-17.  The delay between Meyer Group's submission of this location until the letter of intent is signed in May 2011, was due in large part to PRC's general slow pace and the change in brokers. JX 243 at 30:6-14.  The additional delay until January 13, 2012, was due to wholly extraneous circumstances exclusively within the purview of the landlord -- the need to resolve the law firm encumbrances, which had to be worked out between BP and those firms, and the need to wait for BP's lender to approve the transaction.

Mr. Storrs testified that after PRC signed the letter of intent, BP had to move the Goodwin Proctor "must-take" to the fourth floor and that was when the "bulk of the work took place."  JX 243 at 56:9-17.  Mr. Storrs stated that it was a similar scenario for the Finnegan Henderson ROFO. Id. at 56:22-1.  Mr. Storrs estimated that approximately 80% of the work was done in July 2011. Id. at 57:11-20.  The delay thus does not suggest that Meyer Group's initial submission of the location was somehow displaced by an intervening cause.  The extension of the Original Lease was for the same space Mr. Meyer had initiated, and the duration of the Seventh Amendment to the Original Lease was only two months longer than that proposed in Mr. Meyer's counterproposal.  There were no major changes to the deal Mr. Meyer and Mr. Storrs had proposed in January and March 2010.

Mr. Warkentin also stated that there were situations when even a two-year extension period could be reasonable. Tr. 465:15-466:5 (Warkentin). Here, had third-party involvement not prevented the signing of the Seventh Amendment to the Original Lease until January 13, 2012, the evidence suggests that the lease extension would have been signed in May or June 2011, -- only two to three months outside a 12-month period.  Similarly, the first Bryan Cave sublease for the fifth floor that Meyer Group had submitted to PRC was signed within a reasonable timeframe after termination of the Agreement -- one year and 47 days.

However, the third and final Bryan Cave sublease was not executed within a reasonable time after Meyer Group's Agreement was terminated on March 29, 2010.  This third sublease, which amended the lease period and rent terms for the fifth-floor sublease, was not signed until July 1, 2012, 825 days after PRC terminated the Agreement and nearly seven months after the signing of the Seventh Amendment to the Original Lease.  JSF ¶ 27.  This transaction arose from the need to extend the final date of the first Bryan Cave sublease from June 30, 2012 to March 29, 2015.  Unlike the Seventh Amendment to the Original Lease, this sublease extension was executed well beyond even two years after the Agreement was terminated.  There is no evidence that this transaction, like the Seventh Amendment to the Original Lease, had been initiated earlier, but was delayed due to external factors, and was similar to a proposal Meyer Group had been negotiating. Nor has Plaintiff established that the need to extend this Bryan Cave sublease was on the horizon before the Agreement was terminated.

**The Market Rate for Meyer Group's Commercial Real Estate Brokerage Commission**

The Court finds that a 3.5% commission is appropriate for the Seventh Amendment to the Original Lease as that was the market rate in Washington, D.C. in January 2012, when that amendment was signed.  The Court recognizes that Mr. Meyer testified that he received a 4% commission on the Original Lease in 2005, and that 4% "still [was]" the market rate. Tr. 23:19-21 (Meyer).  Similarly, Meyer Group's expert, Mr. Kaplan, testified that in 2012, 3% to 4% was

"more common," with the market moving toward 4%. Tr. 229:9-15.[17] Mr. Storrs wrote two emails in preparation for paying CBRE a commission. In an email to BP's lenders, dated December 28, 2011, Mr. Storrs summarized the Seventh Amendment to the Original Lease and stated that the commission would be 3.5% as 3.5% to 4% with 100% upfront "is the market now."[18] JX 228 at 2. In a similar email, dated January 4, 2012, Mr. Storrs noted that CBRE had asked for a 4% commission, but that he had "talked them down" to 3.5% with 50% up front and 50% discounted by 8% and paid in 2015. JX 230. The arm's length negotiations between CBRE and BP indicate that both parties were willing to accept a 3.5% commission in January 2012. [19] This rate also comports with Mr. Kaplan's expert opinion, as it falls within the 3% to 4% range he named for the market rate. Tr. 229:9-15 (Kaplan). Mr. Warkentin did not testify about a 2012 market rate. As such, the Court finds that 3.5% would be an appropriate market rate for a commission on the Seventh Amendment to the Original Lease.

There is little information in the record as to the market rate for commissions in May 2011, when the first Bryan Cave sublease was signed. However, the first sublease itself stated that CBRE would receive a 3% commission, which is probative evidence of what the parties were willing to accept as a market rate in this timeframe. Therefore, the Court uses a 3% market rate for the commission for the first Bryan Cave sublease for the fifth floor.

**Meyer Group Can Recover Damages from PRC** [20]

Defendant argues that Meyer Group cannot recover damages from PRC because the Agreement states that the landlord generally assumes the responsibility of paying the commission to the broker. Def. Post-Trial Br. 99. Defendant thus asserts that Meyer Group's sole remedy is a declaratory judgment "requiring PRC to inform the landlord that Meyer Group should be recognized as PRC's exclusive broker, pursuant to the terms of the agreement, for certain disputed transactions," and then Meyer Group must negotiate separately with the landlord. Id.

---

[17]     Defendant notes that Mr. Storrs testified at deposition about a 1% to 4% commission rate. Def. Reply Br. 55. However, Mr. Storrs made this response when asked what is the "current going rate" for brokerage commissions. JX 243 at 28:9-17. As Mr. Storrs was deposed in March 2013, this is not evidence of what market rate applied in January 2012.

[18]     Mr. Storrs testified at deposition that 2% to 3% was the market rate in January 2012. JX 243 at 29:14-17.

[19]     The record does not contain documentary evidence showing that a commission in a specific amount was paid to CBRE by BP on the Seventh Amendment to the Original Lease. Ms. Grove testified that to her knowledge CBRE had not been paid a commission. Tr. 422:3-6 (Grove)

[20]     The landlord was not a party to this action, and this ruling does not address whether PRC may seek indemnification from the landlord, as it was the landlord, not PRC, the tenant, that was obligated to pay Meyer Group the commission in the first place. The Government is liable here for damages stemming from its breach of the exclusive brokerage agreement, and the amount of the commission Meyer Group would have received from the landlord but for that breach is the appropriate measure of damages.

Once an injured party establishes a breach of an enforceable contract, that party has a right to damages unless the breach caused no loss or the party cannot prove a loss. RESTATEMENT (SECOND) OF CONTRACTS § 346 (1981). Expectation damages are measured by "(a) the loss in the value to him of the other part''s performance caused by its failure or deficiency, plus (b) any other loss, including incidental or consequential loss, caused by the breach, less (c) any cost or other loss that he has avoided by not having to perform." Id. at § 347. A party that establishes a breach of contract may recover expectancy damages "sufficient to place the injured party in as good a position as he or she would have been had the breaching party fully performed." San Carlos Irrigation & Drainage Dist. v. United States, 111 F.3d 1557, 1562-63 (Fed. Cir. 1997) (citing Estate of Berg v. United States, 231 Ct. Cl. 466 (1982)).

To recover expectancy damages for a breach of contract, a plaintiff must establish that (1) the damages were caused by the breach; (2) the damages were reasonably foreseeable at the time the contract was entered into; and (3) the measure of damages are reasonably certain. See, e.g., SGS-92-X003 v. United States, 118 Fed. Cl. 492, 524 (2014) (citing Kan. Gas & Elec. Co. v. United States, 685 F.3d 1361, 1369 (Fed. Cir. 2012) (internal citations omitted)). Causation, foreseeability, and proof of damages are issues of fact. See Anchor Sav. Bank, FSB v. United States, 597 F.3d 1356, 1361 (Fed. Cir. 2010); Fifth Third Bank v. United States, 518 F.3d 1368, 1375 (Fed. Cir. 2008);Bluebonnet Sav. Bank, F.S.B. v. United States, 266 F.3d 1348, 1355-57 (Fed. Cir. 2001)). Plaintiff has the burden of proof on the three elements. SGS-92-X003, 118 Fed. Cl. at 524 (citing Yankee Atomic Elec. Co. v. United States ("Yankee II"), 536 F.3d 1268, 1273 (Fed. Cir. 2008); Bluebonnet Sav. Bank, 266 F.3d at 1355).

## Causation

Plaintiff has the burden of proving that its damages resulted from PRC's breach of the Agreement. The Court must determine which legal standard to apply in assessing causation, as it has discretion to choose from the "but for" or "substantial factor" standard. See Citizens Fed. Bank v. United States, 474 F.3d 1314, 1318 (Fed. Cir. 2007) ("[T]he selection of an appropriate causation standard depends upon the facts of the particular case and lies largely within the trial court's discretion."). Under the "but for" test, the plaintiff must show that the claimed losses "would not have occurred but for the breach," although the breach need not be the sole cause, to recover damages. Cal. Fed. Bank. v. United States, 395 F.3d 1263, 1268 (Fed. Cir. 2005); Anchor Sav. Bank, FSB v. United States, 81 Fed. Cl. 1, 60 (2008). Furthermore, the plaintiff must show that damages flow "inevitably and naturally" from the breach. Citizens Fed. Bank, 474 F.3d at 1318 (quoting Myerle v. United States, 33 Ct. Cl. 1, 27 (1897)). "The substantial factor standard is properly invoked when the parties assert multiple possible causes for the claimed damages." Am. Sav. Bank, F.A. v. United States, 98 Fed. Cl. 291, 301 (2011) (citing Citizens Fed Bank, FSB v. United States, 59 Fed. Cl. 507, 514-516 (2004)). While the Court enjoys the discretion to use the substantial factor test, it is "not preferred" by the Federal Circuit. Yankee II, 536 F.3d at 1272.

Here, the Court will apply the "but-for" standard, as Meyer Group does not assert that any factor other than PRC's breach prevented it from receiving commissions on the Seventh Amendment to the Original Lease and the first Bryan Cave fifth floor sublease. In this case, PRC's breach was the "but-for" cause of Meyer Group's damages. PRC breached the Agreement by failing to recognize Meyer Group as its exclusive real estate broker and procuring cause for the Seventh Amendment to the Original Lease and the first Bryan Cave fifth floor sublease. See JX 27. Had PRC honored the terms of the Agreement, Meyer Group would have been paid

commissions by BP.  As such, the amount of these commissions represents Meyer Group's expectancy damages.

**Foreseeability**

Foreseeability means that "the injury actually suffered must be one of a kind that the defendant had reason to foresee and of an amount that is not beyond the bounds of reasonable prediction."  Citizens Fed. Bank, 474 F.3d at 1321 (quoting Joseph M. Perillo, 11 Corbin on Contracts § 56.7 at 108 (2005 rev. ed.)).  Damages must be "reasonably foreseeable by the breaching party at the time of contracting."  Vt. Yankee Nuclear Power Corp. v. Entergy Nuclear Vt. Yankee, LLC, 683 F.3d 1330, 1344 (Fed Cir. 2012) (citing Williston on Contracts § 64.29). Furthermore, "the particular details of a loss need not be foreseeable," as long as the "specific mechanism of loss" was foreseeable.  Anchor Sav. Bank, FSB, 597 F.3d at 1362.

In this case, the Agreement specifically required PRC to "cooperate and work with The Meyer Group, Ltd. in its efforts to obtain its commission," to "inform the landlord" of Meyer Group's representation of PRC before PRC entered into any lease agreement, and to make the landlord undertake an obligation to pay Meyer Group a commission, "in accordance with a typical market rate," as a condition of entering into a lease agreement.  JX 27 at 2. These terms make clear that at the time of contracting, if PRC failed to recognize Meyer Group as its exclusive broker and procuring cause for submitted transactions after the termination of the Agreement, Meyer Group would suffer the loss of market-rate commissions.  Indeed, the conduct of the parties when the Original Lease was signed confirms this understanding, as Meyer Group received its commission and the Original Lease contained a provision recognizing Meyer Group as the broker.  JX 29 at 43.

**Reasonable Certainty**

A plaintiff must show damages with reasonable certainty. While it is the plaintiff's burden to prove damages, "where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision: 'It is enough if the evidence adduced is sufficient to enable a court or jury to make a fair and reasonable approximation.'"  Elec. & Missile Facilities v. United States, 189 Ct. Cl. 237, 257 (1969) (citing Specialty Assembling & Packing Co. v. United States, 174 Ct. Cl. 153, 184 (1966); WRB Corp. v. United States, 183 Ct. Cl. 409, 425 (1968)).  "If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery."  Ace-Federal Reporters, Inc. v. Barram, 226 F.3d 1329, 1333 (Fed. Cir. 2000) (quoting Locke v. United States, 151 Ct. Cl. 262, 267 (1960)).

There was no evidence at trial as to the total gross aggregate lease value of the Seventh Amendment to the Original Lease.  See Tr. 228:23-24 (Kaplan) ("In this market, commissions are generally a percentage of the gross value of the lease over the entire lease term.").  Meyer Group's post-trial brief states that this value is $11,491,021.71, but provides no indication as to how this number was calculated from the documents in the record.  Pl. Post-Trial Br. 74. On November 26, 2014, the Court ordered Meyer Group to file a supplemental brief "setting forth, with citations to the record, the total gross aggregate lease value for the Seventh Amendment to the Original Lease . . . , and an explanation of how such values were calculated."

Plaintiff filed this supplemental brief on December 12, 2014, and notes that Mr. Meyer defined the term "gross aggregate lease value" as

> [t]he sum of all the rent the tenant is going to pay, over the term of whatever lease they sign, and if it's a triple net lease, it would also include a gross-up amount to be added for the entire term of the lease for purposes of calculating what the commission would be.

Tr. 23:8-18 (Meyer). Plaintiff also quotes Mr. Meyer defining a triple net lease as

> Triple net is a form of rent structure where the tenant is basically paying for the shell space, and that's the rent for the space. So, you could say $27 a foot. And then whatever the costs are to operate the building, for both operating expenses and real estate taxes, that is added to the triple net rent to formulate a full – full-service rent. A full rent.

Tr. 21:23-22:5 (Meyer).

Plaintiff's assertion that the total gross value of the lease was $11,491,021.71 appears to be derived from an email of Mr. Storrs dated January 4, 2012. JX 230. Plaintiff relies on this email in its supplemental brief to prove what a 4% commission on the Seventh Amendment to the Original Lease would be. Pl. Suppl. Br. 2. In this email to a JP Morgan employee, Mr. Storrs discussed the amount of CBRE's commission and stated that a 4% commission would be $459,640.87 and that a 3.5% commission with the second payment discounted by 8% would be $352,220.94. JX 230. Plaintiff thus seems to have worked backwards from the $459,640.87 quoted in Mr. Storrs' email to arrive at the $11,491,021.71 gross aggregate lease value amount in its post-trial brief, as $459,640.87 is 4% of $11,491,021.71.

In its response to Plaintiff's supplemental brief, Defendant argues that Plaintiff did not provide any explanation about how the gross aggregate lease value was calculated and that Mr. Storrs' email merely represents his "then-existing view on the value of a four-percent commission" and "establishes neither the aggregate lease value nor the gross-up." Def. Suppl. Br. 2. Defendant further argues that Mr. Meyer's testimony proves that further inputs are needed to calculate the gross aggregate lease value. Id. Defendant therefore asserts that Plaintiff has failed to prove its measure of damages. Id. at 3.

Mr. Storrs, as an employee of the landlord, had the values of the different rent structures and add-ons on hand in order to calculate a 4% commission. Mr. Storrs had no reason to exaggerate his calculation, as his company would be paying the commission and needed the lender's approval. As Mr. Storrs' email provides a value for a 4% commission, the Court can make a "fair and reasonable" determination of what a 3.5% commission would be. As such, Plaintiff has proved damages to a reasonable certainty.

The number used in Mr. Storrs' email, $459,640.87, is 4% of $11,491,021.75. Using $11,491,021.75 as the gross aggregate lease value yields a 3.5% 2012 market rate commission of $402,185.76. Therefore, the Court awards Plaintiff damages of $402,185.76 on the Seventh Amendment to the Original Lease.

Both parties agree that the first Bryan Cave sublease was not a triple-net lease and simply consisted of $4,750 in monthly rent and 13.5 months of rent.  This amounts to a total lease value of $64,125,[21] and 3% of this amount is $1,923.75.  Plaintiff's damages are thus $404,109.51. Plaintiff is entitled to interest on $404,109.51 as provided under the CDA, 41 U.S.C. § 7109(a)(1) (2012).[22]  Pl. Post-Trial Br. 75; Def. Post-Trial Br. 99.

## Conclusion

1.      The Clerk of Court is directed to enter judgment in favor of Plaintiff in the amount of $404,109.51, plus interest calculated from May 3, 2012, pursuant to 41 U.S.C. § 7109(a)(1) (2012).

2.      Defendant's motion to strike Plaintiff's Exhibit 2 is **GRANTED**.


s/Mary Ellen Coster Williams
**MARY ELLEN COSTER WILLIAMS**
**Judge**

---

[21]     Plaintiff calculated this amount as $59,665, which appears to be a mathematical error, as $4,750 multiplied by 13.5 is $64,125.

[22]      Interest runs from the date of Plaintiff's claim on May 3, 2012.  See 41 U.S.C. § 7109(a)(1) (2012) ("Interest on an amount found due a contractor on a claim shall be paid to the contractor for the period beginning with the date the contracting officer receives the contractor's claim . . . until the date of payment of the claim.").